UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEREK VAN JACKSON,

        Plaintiff,               Case No. 2:15-cv-13792
                                  District Judge Matthew Leitman
v.                              Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 16) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 13)

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 16), **DENY** Plaintiff's motion for summary judgment (DE 13), and

**AFFIRM** the Commissioner's decision.

**II.**    **REPORT**

Plaintiff, Derek Van Jackson, brings this action under 42 U.S.C. § 405(g) for

review of a final decision of the Commissioner of Social Security

("Commissioner") denying his application for supplemental security income

("SSI").[1]  This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 13), the

Commissioner's memorandum in opposition and cross motion for summary

judgment (DE 16), and the administrative record (DE 11).

### A.   Background

Plaintiff filed his application for SSI in June 2012, alleging his disability

began on June 1, 2003.[2]  (R. at 310-315.)  Plaintiff's application was denied (R. at

---

[1] Plaintiff also unsuccessfully sought disability insurance benefits ("DIB") at the administrative level, but has abandoned his DIB claim in this Court.  (*See* DE 13 at 9 ("Mr. Jackson also specifically contends that the Commissioner erred as a matter of law in denying his claims for SSI benefits for the reasons set forth below. No appeal from the denial of Title 2, DIB benefits has been taken here.")).  This Report and Recommendation, therefore, will focus primarily upon Plaintiff's request for SSI.  However, though there are different administrative regulations for resolving SSI claims and DIB claims, the analytical framework for each is essentially the same.  *Craft v. Astrue*, 539 F.3d 668, 674, n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case. For simplicity, we will cite only to the DIB sections."); *Roby v. Comm'r of Soc. Sec.*, 2013 WL 451329, at *3 (E.D. Mich. Jan. 14, 2013) (Randon, M.J.) ("The federal court's standard of review for SSI cases mirrors the standard applied in social security disability cases. The standard for disability under both the DIB and SSI programs is virtually identical.") (quotation marks and citations omitted), *report and recommendation adopted at* 2013 WL 450934 (E.D. Mich. Feb. 6, 2013) (Goldsmith, J.).

[2] Though Plaintiff's 2012 application alleged an onset date in 2003, he could not have received "retroactive" SSI benefits. 20 C.F.R. §416.335 ("When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet

179-182) and he sought a *de novo* hearing before an Administrative Law Judge

("ALJ").  (R. at 185.)  ALJ Ben Barnett held a hearing on July 3, 2013.  (R. at 49-

90.)  On August 13, 2013, ALJ Barnett ALJ issued an opinion which found

Plaintiff to not be disabled.  (R. at 128-140.)

In March 2015 the Appeals Council vacated and remanded the ALJ's

decision, primarily because the ALJ's decision failed to contain an analysis of the

opinion of consultative examiner Anthony Gensterblum, Ph.D.  (R. at 150-152.)

Thus, among other things, the Appeals Council directed the ALJ to evaluate Dr.

Gensterblum's opinion as part of the residual functional capacity ("RFC")

determination.[3]  (R. at 152.)

On remand, the case was assigned to ALJ Paul Jones, who held another

hearing on June 9, 2015.  (R. at 20-48.)  On June 12, 2015, ALJ Jones issued a

decision which again found Plaintiff to not be disabled.  (R. at 154-167.)    On

September 15, 2015, the Appeals Council denied Plaintiff's request for review of

ALJ Jones's decision.  (R. at 1-3.)  ALJ Jones's decision thus became the

---

all the other requirements for eligibility, we cannot pay you for the month in which
your application is filed or any months before that month.").

[3] A claimant's "residual functional capacity" is an assessment of the most he or she
can do in a work setting despite his or her physical or mental limitations. 20
C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir.
2002).

Commissioner's final decision.  Plaintiff then timely commenced the instant action.

**B.    Plaintiff's Medical History**

In a disability report he completed in July 2012, Plaintiff listed a host of physical and mental conditions which he believed limited his ability to work, including, *inter alia*, diverticulitis, carpal tunnel syndrome, "sleep issues" and "mental issues[.]"  (R. at 375.)  Toward that end, in March 2010, Nadeem Ullah, M.D., diagnosed Plaintiff with lower esophagitis (Grade II to Grade III), Mallory-Weiss tear and gastritis.[4]  (R. at 509.)  A colonoscopy performed by Vishal Gupta, M.D., in September 2010 revealed diverticulitis in Plaintiff's ascending colon.[5]  (R. at 497.)

---

[4] Esophagitis is "inflammation of the esophagus[.]"  https://www.merriam-webster.com/dictionary/esophagitis#medicalDictionary (last visited February 7, 2017).  Gastritis is "inflammation especially of the mucous membrane of the stomach[.]"  https://www.merriam-webster.com/dictionary/gastritis#medicalDictionary (last visited February 7, 2017).  "Mallory-Weiss tearing (MWT) is characterized by linear, non-perforating mucosal laceration at the lower part of the esophagus and/or upper part of the stomach."  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4381135/ (last visited February 7, 2017).

[5] Diverticulitis is "inflammation or infection of a diverticulum of the colon that is marked by abdominal pain or tenderness often accompanied by fever, chills, and cramping[.]"  https://www.merriam-webster.com/dictionary/diverticulitis#medicalDictionary (last visited February 7, 2017).  Diverticulum is "an abnormal pouch or sac opening from a hollow organ (as the intestine or bladder)[.]"  https://www.merriam-webster.com/dictionary/diverticulum (last visited February 7, 2017).

Plaintiff was treated for depression by Lifeways Community Mental Health in 2011. (R. at 466-469.) A treatment report noted that Plaintiff would benefit from therapy to help with his depression and thoughts of violence, but it also described Plaintiff's condition as "improved" and noted he was a full-time student studying to be an electrician. (R. at 467-468.) Also in 2011, Bhavna Shah, M.D., diagnosed Plaintiff with moderate carpal tunnel syndrome. (R. at 513.) In 2013, Plaintiff was diagnosed with obstructive sleep apnea by Timothy Murray, M.D. (R. at 629.) In May 2013, Plaintiff had hip replacement surgery. (R. at 868.)

Of particular significance to this action is the December 2012 consultative psychological exam of Plaintiff performed by Dr. Gensterblum. (R. at 589-594). That exam was explicitly based upon statements made by Plaintiff to Dr. Gensterblum, a function report prepared by Plaintiff's girlfriend and an October 2011 summary prepared by Lifeways. (R. at 589.) Indeed, a significant amount of the report is a recitation of what Plaintiff told Dr. Gensterblum. (R. at 589-591.) Dr. Gensterblum diagnosed Plaintiff as having major depressive order, antisocial personality disorder and assigned him a global assessment of functioning ("GAF") score of 39.[6] (R. at 592.) Dr. Gensterblum opined that Plaintiff had the ability to

---

[6] As previously explained by this Court:

The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th

understand simple instructions but had trouble retaining information.  (R. at 593.)

Additionally, Dr. Gensterblum concluded that Plaintiff "would likely be unable to

tolerate normal work or even treatment environments for more than a few months

at a time[,]" and that Plaintiff's depression and other concerns "would significantly

compromise attendance and make it impossible for him to work in an environment

that required a consistent, inflexible work schedule."  (R. at 593.)

### C.   Administrative Proceedings

#### 1.  Pre-remand Proceedings

##### a.  Plaintiff's Original Hearing Testimony

At the July 2013 hearing, Plaintiff testified that he lived in a second-floor

apartment but had difficulty navigating the twenty-five stairs to reach his residence

---

ed.1994) at 30. It ranges from 100 (superior functioning) to 1
(persistent danger of severely hurting self or others, persistent
inability to maintain minimal personal hygiene, or serious suicidal act
with clear expectation of death). *See id.* at 32. A GAF score of 31–40
indicates "some impairment in reality testing or communication (e.g.,
speech is at times illogical, obscure, or irrelevant) or major
impairment in several areas such as work or school, family relations,
judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the
patient has "[s]erious symptoms ... OR any serious impairment in
social, occupational, or school functioning (e.g. no friends, unable to
keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of
moderate difficulty in social or occupational functioning. *Id.*

*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n.1 (E.D. Mich. 2005). However,
"the most recent version of the DSM does not include a GAF rating for assessment
of mental disorders." *Bryce v. Comm'r of Soc. Sec.*, 2014 WL 1328277, at *10
(E.D. Mich. Mar. 28, 2014) (Goldsmith, J.).

because he had not fully recovered from May 2013 hip surgery.  (R. at 58.)
Plaintiff lived with his then-two year old child and the child's mother.  (R. at 59.)
Plaintiff did not drive because his license had been suspended due to drinking and
driving.  (R. at 59.)  Plaintiff had completed tenth grade and did not have a GED.
(R. at 83-84.)

Plaintiff did very little shopping or socializing.  (R. at 60.)  As far as
household chores, Plaintiff stated he helped take care of his young daughter but did
not wash clothes, vacuum, etc.  (R. at 61-62.)  Plaintiff vomited frequently and had
gained about twenty pounds in the past year.  (R. at 63.)  Plaintiff was taking
OxyContin for pain.  (R. at 65.)  He also took Paxil for depression but still felt
angry.  (R. at 66.)  Plaintiff did not see a therapist regularly.  (R. at 68-69.)  He felt
fatigued "all the time" and had racing thoughts.  (R. at 69.)  His left hand was
numb and he dropped items frequently.  (R. at 70.)   Plaintiff had trouble getting
along with people, especially former bosses, due to feeling unappreciated.  (R. at
71-72.)   Plaintiff studied full-time to be an electrician from 2009 to 2011 but did
not get his certification because he began feeling sick.  (R. at 80.)  Plaintiff used
marijuana for pain two to three times per week.  (R. at 80.)

### b. ALJ's Decision

In his August 13, 2013 decision, ALJ Barnett found that Plaintiff remained
insured through March 30, 2009, and the relevant time period for his SSI claim

was from June 21, 2012 to the present.  (R. at 128.)  At **Step 1** of the sequential

evaluation process,[7] the ALJ found Plaintiff had not engaged in substantial gainful

activity since June 1, 2003, the alleged onset date.  (R. at 130.)  At **Step 2**, the ALJ

found the following severe impairments from June 1, 2003 through March 30,

2009 (the date last insured):  "major depressive disorder; antisocial personality

disorder; carpal tunnel syndrome; degenerative joint disease; and status post right

hip replacement . . . ."  (R. at 131.)  The ALJ found the following severe

impairments from June 21, 2012 onwards:  "major depressive disorder; antisocial

personality disorder; carpal tunnel syndrome; degenerative joint disease; status

post right hip replacement; sleep apnea and diverticulitis . . . ."  (*Id.*)  At **Step 3**,

---

[7] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4), 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered the sequential review considers and answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?
    2.    Does the claimant suffer from one or more severe impairments?
    3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1?
    4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
    5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 131-132.)

Prior to undertaking Step 4, the ALJ evaluated Plaintiff's RFC and determined that from June 2003 to March 2009 he had the capacity to perform light work[8] with some limitations, such as sundry exertional limitations and requirements that the work be simple, routine, repetitive and the like.  (R. at 133-135.)  From June 2012 onwards, the ALJ found that Plaintiff had the ability to perform sedentary work[9] with some limitations, such as no production rate or pace work.  (R. at 135-137.)  At **Step 4**, the ALJ found that Plaintiff could not perform his past relevant work.  (R. at 137-138.)  Finally, at **Step 5** the ALJ found that Plaintiff could perform other jobs, such as sorter and document preparer.  (R. at

---

[8] In relevant part, light work is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §404.1567(b).

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §404.1567(a).

138-139.)  Consequently, the ALJ concluded that Plaintiff was not disabled.  (R. at 139-140.)

### 2.  Post-remand Proceedings

#### a.  Plaintiff's Testimony

After the Appeals Council remanded with instructions to consider the opinions of Dr. Gensterblum (which were not discussed in ALJ Barnett's decision), the matter was reassigned to ALJ Jones, who held a hearing on June 9, 2015.  (R. at 20-48.)  At that hearing, Plaintiff was forty-nine years old, was approximately five feet, nine inches tall and weighed "about" 215 pounds.[10]  (R. at 23-24.)  Plaintiff's weight does not cause him any problems.  (R. at 25.)

Plaintiff is single and sometimes is homeless, though other times he stays with his on again-off again girlfriend (who is the mother of his young child).  (R. at 25-26.)  Plaintiff did not give a direct answer when repeatedly asked by the ALJ how often he slept outside compared to how often he slept at his girlfriend's residence; instead Plaintiff angrily remarked on how the "last representative" (presumably ALJ Barnett) had not believed his girlfriend's statements.  (R. at 26-28.)  Eventually, the seemingly flustered ALJ remarked "[s]o no real answer to that one."  (R. at 28.)  Plaintiff has no income and completed only the tenth grade,

---

[10] Bizarrely, Plaintiff said he thought he was "streaking" when asked his height by the ALJ.  (R. at 23-24.)  Eventually, Plaintiff stated he was about 5'8" to 5'9" tall. (R. at 24.)

though he also took some college courses, remarking that "[i]t don't [sic] take a high school diploma to get college credits."  (R. at 28-29.)  Plaintiff is able to read and write.  (R. at 29.)

Plaintiff appeared somewhat angry when the ALJ asked about his ability to perform "simple math."  Specifically, the following colloquy occurred:

Q  Do you know how to do simple math?

A  What is simple math?  Adding and subtracting?

Q  Okay.

A  Multiplication?  Fractions?

Q  You know how to do that?

A  I know how to add and subtract, divide, fractions, yes.

Q  Okay.  So the answer's yes to that question?

A  Yes.

Q  Okay.  It would have been a lot easier to just say yes.

A  It would be a lot easier if I wouldn't [sic] be here irritated, but I am.

Q  Why are you irritated?

A  Because, you know, I don't understand why I'm back here.  You know, everything on [sic] my record speaks for itself.

Q  You asked for a hearing.  That's why you're here.

A  Yeah, I asked—

11

Q  You asked for this.

A  --I asked for an appeal.

Q  Okay.

A  I didn't ask to go back to a hearing to be represented to—in front of somebody—

Q  Yeah.

A  --that really don't [sic] care about me.

(R. at 29-30.)  Shortly thereafter, Plaintiff testified that he had no income and was not currently working.  (R. at 30-31.)  Later, the ALJ asked Plaintiff if he was "still smoking drugs" and Plaintiff eventually responded that he smoked "pot" and had done so three days ago.  (R. at 31.)

Unfortunately, the proceedings became even more tense shortly thereafter, when the ALJ asked Plaintiff how much weight he lifted during his prior employment with Lafire Forge and Machine.  Plaintiff responded "[s]ometimes I'd lift 40,000 pounds a day."  (R. at 32.)  The ALJ expressed incredulity that anyone could lift 40,000 pounds, remarking that was "impossible" and asking how Plaintiff could lift such weight.  (R. at 33.)  Plaintiff then began to try to explain, ramblingly, that he lifted parts weighing thirty-nine pounds repeatedly during the course of a day, whereupon the ALJ declared a short recess to allow Plaintiff a chance to speak with his attorney with an eye towards being more respectful and less argumentative.  (R. at 33.)

Shortly after the hearing resumed, Plaintiff testified that he had hip replacement surgery in May 2013. (R. at 35.) Plaintiff then testified that he has trouble finding doctors who accept his insurance. (R. at 37.) When asked if he is "better off" sitting or standing, Plaintiff equivocally responded that "[i]t depends." (R. at 38.) Plaintiff denied ever having taken cocaine, admitted he still smokes cigarettes and admitted that he used marijuana daily until "[s]ometime this year." (R. at 38-39.)

### b. VE's Testimony

Sandra Steele testified as a vocational expert ("VE"). (R. at 40-47.) The VE classified Plaintiff's prior work as a human services aide as light and semiskilled and his work as a foundry utility worker to be heavy and unskilled. (R. at 41-42.) The ALJ then asked the VE if a person with Plaintiff's age, education and experience could perform Plaintiff's past relevant work, with the following limitations:

> could do limited light work and by that I'm going to define further as lifting up to 20 pounds occasionally, but standing or walking for two hours and sitting up for six hours in an eight-hour workday with normal breaks and who can frequently handle bilaterally; frequently finger bilaterally; can only frequently be exposed to the non-weather related extremes of cold and heat; can only frequently be exposed to vibration; in [sic] simple, routine, and repetitive tasks with occasional public interaction and occasional supervision and no other limitations.

(R. at 42.) The VE said "no." (*Id.*) The VE did testify, however, that there were other jobs in the national economy which such a person could perform, like bench

assembler (110,000 jobs nationally) and sorter/packer (85,000 jobs nationally).  (R. at 43-44.)[11]

### c.  ALJ's Decision

In his June 12, 2015 decision, ALJ Jones found that Plaintiff was insured through June 30, 2009.  (R. at 159.)  At **Step 1**, the ALJ found that Plaintiff did not engage in substantial gainful activity from the alleged onset date of June 1, 2003 to June 30, 2009, his date last insured.  (*Id.*)  The ALJ also found that Plaintiff had not engaged in substantial gainful activity since the June 2012 SSI application date. (R. at 160.)  At **Step 2**, the ALJ found Plaintiff to have the following severe impairments:  "right hip replacement; obesity; bilateral carpal tunnel syndrome; substance abuse (marijuana, cocaine, tobacco); personality disorder; and affective disorder . . . ."  (R. at 160-162.)   At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.  (R. at 162-163.)

Prior to undertaking a Step 4 analysis, the ALJ found that Plaintiff's RFC allowed him to perform light work except he "can only stand/walk for 2 hours and sit for up to 6 hours in an 8-hour workday, with normal breaks; frequently handle and finger objects bilaterally; with only frequent exposure to vibration; in [sic]

---

[11] The VE was not asked to provide the number of jobs available regionally and Plaintiff has not raised that omission as a basis for relief.

simple, routine, repetitive tasks; with occasional interaction with the public and supervision."  (R. at 163.)  In his RFC discussion, the ALJ noted that he found Plaintiff to not be entirely credible, noting the difference between Plaintiff's testimony at the hearing that he never used cocaine and the contrary statements in the medical record, and further observing that while Plaintiff self-reported "to multiple sources that he had relationship and anger issues" and acted "non-responsive and argumentative" at the hearing, he was able to quickly "modify his behavior" after conferring with his attorney and was reported to be "cooperative and appropriate" by clinicians on multiple occasions.  (R. at 164.)  The ALJ also discussed Dr. Gensterblum's opinions.  (R. at 164.)

At **Step 4**, the ALJ found that Plaintiff could not perform his past relevant work.  (R. at 165-166.)  At **Step 5**, the ALJ found that Plaintiff could perform other jobs that exist in the national economy, giving particular credence to the VE's testimony that a person with Plaintiff's RFC could work as, among other things, an assembler and a sorter/packer.  (R. at 166.)  Therefore, the ALJ found that Plaintiff was not disabled since June 21, 2012, when his application was filed.  (R. at 167.)

### D.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384,

395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## E.  ANALYSIS

Plaintiff raises three issues.[12]  First, he contends the ALJ "fail[ed] to comply with 20 C.F.R. § 416.927 in not according adequate weight to either the opinion of

---

[12] Plaintiff's motion lists the issues presented on page 10 of his brief in support of his motion for summary judgment, immediately after his presentation of the facts and immediately before his discussion of the standards of review.  (DE 13 at 17.)  Thus, the motion does not comply with LR 7.1(d)(2), which provides in relevant part that "[a] brief supporting a motion or response must, *at the beginning*, contain a concise statement of the issues presented *and, on the following page, the controlling or most appropriate authority for the relief sought*." (Emphasis added).  Nor does it comply with Section B of my Practice Guidelines for Social Security

the plaintiff's treating physician or the State Agency's consultive examining physician[.]" (DE 13 at 17) (emphasis omitted). Second, he contends the ALJ "violate[d] SSR 96-8p in not fully considering the effect of the plaintiff's symptoms from his medically established mild degenerative joint disease of left ankle, obesity, sleep apnea, carpal tunnel syndrome, depression and antisocial personality disorder when assessing plaintiff's RFC[.]" (*Id.*) (emphasis omitted). Finally, he contends the ALJ's credibility findings were not supported by substantial evidence. (*Id.*) I will devote a sub-section in this Report and Recommendation to each argument.

### 1. Weight Afforded to Treating & Consultative Providers

Plaintiff's basic argument is that the ALJ failed to afford proper weight to the opinions of Dr. Gensterblum and Larry Farr, D.O., Plaintiff's treating physician. In her response, the Commissioner does not question Dr. Farr's status as a treating physician. Instead, the Commissioner asserts that the ALJ properly considered the opinions of the providers in question. (DE 16 at 7.)

### i. Dr. Gensterblum

The main focus of Plaintiff's argument is on the ALJ's treatment of Dr. Gensterblum. Specifically, Plaintiff alleges the ALJ's analysis of Dr.

---

cases. In the future, counsel is reminded to comply strictly with all applicable Local Rules, as well as the Practice Guidelines of the presiding judicial officers.

Gensterblum's opinions is inadequate.  (DE 13 at 23.)  However, I agree with the

Commissioner that the ALJ sufficiently analyzed Dr. Gensterblum's opinions and

gave adequate reasons for assigning them little weight.

Contrary to Plaintiff's denunciation of the alleged superficiality of the ALJ's

analysis, the ALJ discussed Dr. Gensterblum's opinions at length <u>twice</u> and

referred to Dr. Gensterblum's report in passing additional times.  (*See* R. 161,

164.)  First, in the explanation of why he found certain of Plaintiff's conditions to

be severe impairments, the ALJ wrote the following paragraph:

> On December 5, 2012, claimant was referred for a psychological
> consultative evaluation by the Administration, which was performed
> by Anthony Gensterblum[,] Ph.D., a licensed psychologist.  Claimant
> reported pain that adversely affected his mood, sleep and overall
> functioning.  He stated he had anger issues and history of substance
> abuse (alcohol and cocaine).  Claimant reported he used marijuana
> daily for pain and to get to sleep.  Dr. Gensterblum noted claimant
> presented as depressed and angry during the course of the
> examination.  Claimant recalled six numbers forward, three numbers
> backward and three of three objects after [a] three minute delay.
> Claimant was diagnosed with major depressive disorder, severe
> without psychotic features chronic, atypical type and antisocial
> personality disorder (Exhibit 7F).

(R. at 161.)  Shortly thereafter, in discussing why Plaintiff did not meet any

listings, the ALJ noted that: "[i]n December 2012, Dr. Gensterblum reported

claimant exhibited no problems relating to agency staff.  Claimant stated his

current relationship with his girlfriend had lasted more than two years (Exhibit

7F)[,]" and in the next paragraph noted that "[i]n December 2012, Dr. Gensterblum

noted claimant was able to perform simple math calculations (Exhibit 7F)."  (R. at 162.)

Next, when discussing his RFC determination, the ALJ once again remarked upon Dr. Gensterblum's opinions at length, stating:

> Per the order of [the] Appeal [sic] Council I am evaluating the medical opinion of Dr. Gensterblum.  In October 2012, Dr. Gensterblum opined claimant had the ability to understand simple instructions not requiring completion of multiple step tasks.  He further opined that claimant's ability to retain information was significantly compromised such that he would require continuous reinforcement of instruction until assigned duties became habit.  Dr. Gensterblum opined [that] claimant would likely be unable to tolerate normal work or even [a] treatment environment for more than a few months at a time, be unable to handle significant changes in the work environment, and be unable to work in an environment that required a consistent, inflexible work schedule (Exhibit 7F).  This opinion [sic] is based on what claimant told Dr. Gensterblum, Lifeway's [sic] and his girlfriend, which are his [Plaintiff's] subjective complaints.  I find claimant not credible as delineated above.  Therefore, I give Dr. Gensterblum's opinion little weight.  In addition, Dr. Gensterblum *saw claimant only once* and *does not have a treating relationship with claimant*.

(R. at 164) (emphasis added).

Finally, later in his RFC discussion, the ALJ wrote that "Dr. Gensterblum reported claimant came independently to the exam, [his] clothing was clean and [his] mental status exam responses were spontaneous and well organized (Exhibit 7F)."  (R. at 165.)   Contrary to Plaintiff's argument, it is clear to the Court that the ALJ examined Dr. Gensterblum's opinion in detail.

Having determined that the ALJ adequately discussed Dr. Gensterblum's report, the question becomes whether the ALJ adequately explained his reasons for not affording great weight to Dr. Gensterblum's dire opinions.  I conclude the answer is yes.

First, the ALJ was under no obligation to explain why he rejected the opinions of Dr. Gensterblum since he was not a treating source.  As this Court has previously explained:

> The ALJ was not required to uncritically accept the conclusions of the onetime examiner, Dr. Brady. As a general rule, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination, and an opinion from a medical source who regularly treats the claimant is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship. *See Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir.2013). However, the opinions of a one-time consultative examiner are not entitled to any particular weight, and certainly are not entitled to "controlling weight," like treating physicians, under the Commissioner's regulations. *Id.* at 376. Rather, consulting source opinions are afforded weight according to the factors set forth in 20 C.F.R. § 416.917, including whether they are supported by objective findings, consistent with the record as a whole, and the extent of the physician's relationship to the claimant (which, in the case of an examining consultant, is only a one-time examining relationship). *Moreover, an ALJ need only explain its reasons for rejecting a treating source because such an opinion carries controlling weight under the SSA, and the ALJ is not required to make that same showing for non-treating sources.* An ALJ is permitted to make ... resolutions of conflicting evidence, and there is no specific requirement that this type of decision be set forth in the same type of detail required when rejecting the opinion of a treating source. The ALJ is responsible for weighing opinion evidence. While the ALJ may not simply ignore the opinions of non-treating sources, as long as the record contains

> substantial evidence supporting the ALJ's evaluation of such an
> opinion, that evaluation cannot be second-guessed by a reviewing
> court.

*Tate v. Comm'r of Soc. Sec.*, 2014 WL 4536929, at *19 (E.D. Mich. Sept. 11, 2014) (emphasis added) (Hluchaniuk, M.J.) (quotation marks and citations omitted), *report and recommendation adopted at id.* at *1 (Michelson, J.). While it may have been error to *ignore* Dr. Gensterblum's opinion, as did the first ALJ, it was not error to *reject* it or assign it no weight.

Second, the rationale the ALJ gave for discounting Dr. Gensterblum's opinions was permissible. As the ALJ correctly concluded, a great deal of Dr. Gensterblum's report is based upon Plaintiff's subjective statements and recitation of his complaints. As will be discussed later herein, the ALJ was allowed to discount Plaintiff's credibility. "When a treating medical source's opinion is based on a claimant's subjective complaints and an ALJ properly finds the claimant's subjective complaints not credible, the ALJ can discount the treating medical source's opinion." *Daniel v. Comm'r of Soc. Sec.*, 2014 WL 640706, at *7 (E.D. Tenn. Feb. 18, 2014) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007)).[13] Next, the ALJ was permitted to discount Dr. Gensterblum's opinion

---

[13] In relevant part, the Sixth Circuit held as follows in *Smith*:

> Smith also faults the SSA for failing to give controlling weight to
> Doctors Barber and Griner . . . . These doctors formed their opinions
> solely from Smith's reporting of her symptoms and her conditions, and

to an extent due to him only having seen Plaintiff once, unlike a treating source. *See, e.g., Tilley v. Comm'r of Soc. Sec.*, 394 Fed. App'x 216, 221 (6th Cir. 2010) ("Concerning Dr. Harnisch's opinion, the ALJ pointed out that the largely indecipherable notes reflected just one visit, and primarily reiterated Tilley's subjective complaints . . . . We find the ALJ's determination that the 'objective findings do not support the extreme degree of limitation imposed by this physician' to be supported by substantial evidence.").

Finally, the Court should reject Plaintiff's passing, underdeveloped arguments that: a) the fact that Plaintiff needed a recess to compose himself at the hearing somehow means the ALJ erred by rejecting Dr. Gensterblum's opinions (*see* R. 13 at 24, 29; R. 17 at 3); and, b) the ALJ erred by not finding Plaintiff disabled due to the GAF score assigned by Dr. Gensterblum. First, the fact that Plaintiff was somewhat argumentative and agitated at the hearing, which led to a recess, does not facially impact whether the ALJ erred by not giving more credence to Dr. Gensterblum's opinion. In any event, as the ALJ noted, Plaintiff was able to comport himself more appropriately after the recess, which is in alignment with several notations in the record that he behaved appropriately during

---

the ALJ found that Smith was not credible. Because substantial evidence supports the ALJ's rejection of these reports, we defer to that finding.

482 F.3d at 876-877.

interviews and examinations.  (*See, e.g.,* R. at 372 (notation by a field office

employee who interviewed Plaintiff that he was "talkative and nice[,] joked

around"); 596 (December 2012 consultative report of Sergey Tsekhanov, D.O.,

noting that Plaintiff "was cooperative throughout the exam.")).  In fact, Dr.

Gensterblum's report itself notes that Plaintiff "exhibited no problems relating to

agency staff."  (R. at 590.)  In short, contrary to his curious argument, substantial

evidence demonstrates that Plaintiff is neither some sort of wild man incapable of

behaving appropriately nor incapable of engaging in substantial gainful activity.

Further, and as discussed below, the ALJ observed Plaintiff's behavior with his

own eyes at the hearing, and consequently was in a much better position than this

reviewing court to determine Plaintiff's credibility and to form an opinion as to the

genuineness of his outburst(s).

Second, the fact that Dr. Gensterblum assigned Plaintiff a relatively low

GAF of 39 does not mean that Plaintiff was entitled to benefits or that the ALJ was

required to adopt wholesale Dr. Gensterblum's conclusions.  *See, e.g., DeBoard v.*

*Comm'r of Soc. Sec.*, 211 Fed. App'x 411, 415 (6th Cir. 2006).[14]  The ALJ

---

[14] Specifically, the Sixth Circuit held in *DeBoard*:

> The [Global Assessment Functioning] score is a subjective
> determination that represents 'the clinician's judgment of the
> individual's overall level of functioning. We have previously held that
> the failure to reference a Global Assessment Functioning score is not,
> standing alone, sufficient ground to reverse a disability determination.

expressly noted that he "considered, for what they are worth, any and all GAF

scores found in the record" but, permissibly and consistent with *DeBoard* and

similar cases, remarked that GAF scores "are plucked from a vacuum and provide

only a snapshot of one examiner's opinion of an individual's overall functioning at

that particular moment . . . ."  (R. at 165.)  Such an analysis was permissible.[15]

Indeed, in interpreting the leading psychological treatise on the subject, the Sixth

---

> Moreover, the Commissioner has declined to endorse the [Global
> Assessment Functioning] score for use in the Social Security and
> [Supplemental Security Income] disability programs, and has
> indicated that [Global Assessment Functioning] scores have no direct
> correlation to the severity requirements of the mental disorders
> listings. Accordingly, we have affirmed denials of disability benefits
> where applicants had Global Assessment Functioning scores of 50 or
> lower. *See, e.g., Smith v. Comm'r of Soc. Sec.,* No. 02–1653, 2003 WL
> 22025046, 74 Fed.Appx. 548 (6th Cir. Aug. 27, 2003) (Global
> Assessment Functioning score of 48); *Nierzwick v. Comm'r of Soc.
> Sec.,* 7 Fed.Appx. 358 (6th Cir.2001) (Global Assessment Functioning
> score of 35); *Thurman v. Apfel,* 211 F.3d 1270 (6th Cir.2000) (Global
> Assessment Functioning score of 50).

211 Fed. App'x at 415 (quotation marks and citations omitted).

[15] Though the test was not administered by Dr. Gensterblum, Plaintiff also cites,
fleetingly, the fact that he received a functional assessment score of "3" on a
"LOCUS" test administered at Lifeways Community Mental Health in February
2011.  (R. at 468.)  However, Plaintiff does not cite to authority showing what the
LOCUS test encompasses, what objective evidence it rests upon, or how a score of
"3" thereon should have led the ALJ to determine that Plaintiff was entitled to
benefits, nor did Plaintiff raise the LOCUS test score at the hearing before the ALJ.
The Court deems the underdeveloped LOCUS test issue to have been waived.  *See,
e.g., McClellan v. Astrue*, 804 F.Supp.2d 678, 688 (E.D. Tenn. 2011)
("Furthermore, the court is under no obligation to scour the record for errors not
identified by the claimant, and arguments not raised and supported in more than a
perfunctory manner may be deemed waived . . . .") (citations omitted).

Circuit has expressly noted that a GAF score "may have little or no bearing on the subject's social and occupational functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 511 (6th Cir. 2006). Consequently, the Sixth Circuit expressly noted that it was "not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score[,]" meaning that "[i]f other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is as low as Kornecky's [i.e., 40-45] or even lower." *Id.* Plaintiff's GAF-based argument is without merit.

In short, the ALJ's decision to reject the conclusions of Dr. Gensterblum are supported by substantial evidence. Consequently, the ALJ's decision should be affirmed.

### ii.  Dr. Farr

In March 2013, Dr. Farr completed a medical source statement by hand, upon which Plaintiff places great reliance. (R. at 712-716.) One of the questions in the statement asked Dr. Farr to opine whether Plaintiff could perform a "full time competitive job that requires that activity on a sustained basis[,]" to which Dr. Farr wrote "[d]epends on the job, but I doubt it[.]" (R. at 714.) Another part of the form asked Dr. Farr to opine as to how often Plaintiff would "be likely to be absent from work as a result of the impairments or treatment[,]" and Dr. Farr wrote

"[w]ho knows?  Pt [presumably "patient"—i.e., Plaintiff] has not worked in 10

years[.]"  (R. at 716.)

> The ALJ discussed Dr. Farr's opinions as follows:
>
> In March 2013, Larry Farr[,] D.O., of Allegiance Family Medicine, opined claimant was unable to work in a normal[,] competitive five day a week environment on a sustained basis and his impairment could be expected to last at least six months.  He further opined he did not know how often claimant would likely be absent from work as a result of his impairments since he has not worked in 10 years (Exhibit 11F).  This opinion is ambiguous and not consistent with the record as a whole.  Therefore, I give this opinion little weight.  Furthermore, the issue of disability is reserved for the Commissioner.

(R. at 165.)  Plaintiff asserts that the ALJ was "in a rush to find no disability" and,

consequently, did not adequately explain his rejection of Dr. Farr's conclusions.

(DE 13 at 26.)  I disagree.

The ALJ generally gives deference to the opinions of a treating source

"since these are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring

a unique perspective to the medical evidence that cannot be obtained from the

objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581

F.3d at 408. To qualify as a treating source, the physician must have an "ongoing

treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's

opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r*

*of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not

give a treating source's opinion controlling weight:

> an ALJ must apply certain factors—namely, the length of the
> treatment relationship and the frequency of examination, the nature
> and extent of the treatment relationship, supportability of the opinion,
> consistency of the opinion with the record as a whole, and the
> specialization of the treating source—in determining what weight to
> give the opinion.

*Id.*  Furthermore, an ALJ must "always give good reasons in [the] notice of

determination or decision for the weight [the ALJ] give[s] your treating source's

opinion." 20 C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be

sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that

weight."  *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 550 (6th Cir. 2010)

(internal quotation omitted).

The United States Court of Appeals for the Sixth Circuit has stressed the

importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants
> understand the disposition of their cases," particularly in situations
> where a claimant knows that his physician has deemed him disabled
> and therefore "might be especially bewildered when told by an
> administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d
> Cir.1999). The requirement also ensures that the ALJ applies the
> treating physician rule and permits meaningful review of the ALJ's
> application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33
> (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Better practice likely would have been for the ALJ to have buttressed his opinion by explicitly stating what other evidence in the record he believed to be inconsistent with Dr. Farr's opinions.  However, the ALJ's discussion of the overall record implicitly shows what evidence is inconsistent with Dr. Farr's conclusions.  For example, the ALJ notes that state agency medical consultant Ruqiya Tareen, M.D. opined in November 2012 that "there was insufficient evidence to support a medically determinable impairment through date last insured" and "after claimant's last date insured he can perform simple repetitive task work related activities on a sustained basis and he has moderate limitations in interacting with the general public and supervisors . . . ." (R. at 164-165.)  The ALJ also noted that state agency medical consultant Dinesh Tanna, M.D. opined that Plaintiff could perform light work.  (R. at 165.)  The ALJ also cited various places in the record which showed, among other things, Plaintiff had a normal gait and normal strength.  (*Id.*)  Therefore, the ALJ adequately, though implicitly, explained what evidence in the record contradicted Dr. Farr's conclusions.  *See, e.g., Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x. 462, 472 (6th Cir. 2006) ("We find that the

ALJ's analysis of Nelson's mental problems adequately addressed Dr. Cook's and Dr. Peterson's opinions by indirectly attacking both the consistency of those opinions with the other record evidence and their supportability. The ALJ implicitly provided sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little or no weight overall. The ALJ thus met the goal of [20 C.F.R.] § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation.") (quotation marks omitted).

In addition, Dr. Farr's opinions are indeed ambiguous, as the ALJ cogently noted. His report is littered with equivocal expressions such as "[d]epends[,]" "[u]nable to do[,]" "[u]nknown[,]" "I do not know!" and "[w]ho knows?" (R. at 712, 714, 716.) This can hardly be characterized as definitive, objective medical evidence. The ALJ was permitted to take into account the strikingly ambivalent nature of Dr. Farr's report. *See, e.g., Dallman v. Comm'r of Soc. Sec.*, 2017 WL 470896, at *5 (E.D. Wash. Feb. 3, 2017) (holding that an ALJ was allowed to discount the opinions of a treating source because, among other things, the source's "opinion was equivocal regarding Dallman's ability to respond to stressful situations . . . ."). Notably, his "depends" assessment answers the very question it raises (Depends *on what*?)—it depends "on the job . . ." (R. at 714)—which is the area of expertise of the VE at Step 5. Here the VE found that Plaintiff, taking his

limitations into consideration, could in fact perform work on a sustained basis in the national economy.

Finally, the ALJ was correct in noting that Dr. Farr's opinion that Plaintiff could not work was a *de facto* conclusion that Plaintiff could not perform substantial gainful activity (i.e., he was disabled). The question of whether a claimant is disabled is an area reserved exclusively for the Commissioner, and Dr. Farr's opinion thereon—despite his status as a treating source—is entitled to no deference. *See, e.g., Bass*, 499 F.3d at 511 ("20 C.F.R. § 404.1527(e)(1) explicitly states that the conclusion of disability is reserved to the Secretary, a fact correctly noted by the ALJ. Subsection (e)(3) further elaborates that no 'special significance' will be given to opinions of disability, even if they come from a treating physician.").

In sum, the ALJ adequately explained why he rejected the opinions of Dr. Farr. Therefore, the ALJ's decision should not be disturbed.

### 2. SSR 96-8p

SSR 96-8p provides in relevant part that:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim.

1996 WL 374184, at *5 (July 2, 1996). In a scattershot, one-paragraph long argument, Plaintiff contends that the ALJ failed to comply with SSR 96-8p by not considering all of his impairments, including those found to not be severe. (*See* DE 13 at 27) (asserting the ALJ failed to "fully consider" impairments such as "mild degenerative joint disease of left ankle, obesity, sleep apnea, carpal tunnel syndrome, depression and antisocial personality disorder.") (emphasis removed). Plaintiff also faults the ALJ for not mentioning that Plaintiff uses a cane when questioning the VE and when assessing Plaintiff's RFC.

Contrary to Plaintiff's argument, the ALJ expressly noted that he "*considered all symptoms* and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." (R. at 163) (emphasis added). Moreover, earlier in the opinion the ALJ discussed the impairments Plaintiff now chastises him for allegedly ignoring. In fact, the ALJ even mentions some impairments in his opinion which Plaintiff does not discuss in his motion. Specifically, in the section of the decision in which he explained which impairments of Plaintiff's he believed to be severe, the ALJ stated "[t]he medical records establish claimant has mild degenerative joint disease of [the] left ankle; diverticulitis; diverticulosis; anemia; sleep apnea; colitis; kidney stone; gastritis; and anal warts, which I find to be non-severe medical impairments." (R. at 161.) Shortly thereafter, the ALJ concluded that

"[c]laimant's non-severe medical impairments have only minimal impact on his ability to perform basic work-related activities."  (R. at 162.)  That conclusion is supported by substantial evidence, such as the opinions of Drs. Ruqiya Tareen and Dinesh Tanna, who considered all of Plaintiff's impairments when opining on Plaintiff's mental and physical RFC.  (R. at 98-113.)  Finally, Plaintiff has not shown that his usage of a cane was a significantly disabling factor that should have been accounted for in the RFC analysis.[16]

---

[16] The entirety of Plaintiff's argument regarding the cane usage is: "[i]n this case, the use of a cane was not factored into the RFC or the hypothetical question to the VE. Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies."  (DE 13 at 28.)  The word "cane" appears nowhere else in Plaintiff's motion.

Plaintiff's argument regarding a cane fails on multiple levels.  First, even if the Court were to, solely for purposes of argument, assume that the usage of a cane constitutes a severe impairment, "[a] claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other."  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) (quotation marks and citation omitted).  Plaintiff has not shown how his cane usage, singly or in combination with his other impairments, affects his functional capacity to do work.

Second, and relatedly, Plaintiff's argument regarding his cane usage is so fleeting as to be deemed waived.  *See, e.g., Kennedy v. Comm'r of Soc. Sec.*, 87 Fed. App'x 464, 466 (6th Cir. 2003) ("However, issues which are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quotation marks and citation omitted).  Plaintiff does not cite to the record showing where his usage of a cane was discussed by any providers, or how those providers deemed that cane usage to affect Plaintiff's ability to engage in substantial gainful activity.  The Court will not search the 1,000 plus page record with a fine-toothed comb to help Plaintiff properly develop arguments.  *See, e.g., Davis v. Comm'r of Soc. Sec.*, 2016 WL 4445774, at *10 (E.D. Mich. July 29, 2016) (Patti, M.J.) ("Having already concluded that the

Because RFC is determined immediately prior to Step 4, Plaintiff, not the Commissioner, bears the burden to prove a restrictive RFC.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-392 (6th Cir. 1999); *Perdue v. Colvin*, 2017 WL 362668, at *3-4 (E.D. Mich. Jan. 9, 2017) (Stafford, M.J.).  The Court's review is limited to determining whether the ALJ's determination is supported by substantial evidence. *Rogers*, 486 F.3d at 241.  The ALJ expressly stated that he considered all of Plaintiff's impairments and conditions in determining his RFC, and the ALJ's RFC determination is supported by substantial evidence.  Therefore, the ALJ's RFC determination should be affirmed.[17]

### 3. Credibility

Plaintiff's final argument is that the ALJ improperly diminished Plaintiff's credibility.  In its entirety, Plaintiff's argument is:

---

treating physician's…opinions were properly discounted, the Court has no affirmative duty to go through the state agency reviewer's (or the consultative examiner's) findings with a fine-toothed comb to verify consistency with the 379-page record, particularly where Plaintiff has failed to use the adversarial process to point out any inconsistencies."), *report and recommendation adopted at* 2016 WL 4429641 (E.D. Mich. Aug. 22, 2016) (Leitman, J.).

[17] Because the ALJ's RFC determination should not be disturbed, it inevitably follows that the ALJ's questions to the VE based upon that RFC determination were appropriate and the ALJ was, therefore, allowed to rely upon the VE's responses to determine at Step 5 that there were other jobs available in the national economy which Plaintiff could perform.

As reported on page 8 of this brief, the ALJ made to following programed [sic] credibility statement:

> After careful consideration of the evidence, I find that claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

> [Plaintiff goes on:] The explanation was inadequate. The ALJ found Derek Jackson incredible based on an assertion that while the plaintiff had testified to never using cocaine (AR 19-20) he had told Dr. Gensterblum during a consultive examination that he had used cocaine up to when he became 25 years of age. (AR 590) The ALJ mistakenly identified that the statement was in the Lifeways records. The ALJ and plaintiff did not get along well during the hearing and a recess was called so the plaintiff could regain control of his temper. (AR 33) The fact that he used marijuana as a pain reliever was also a factor in the ALJ's analysis of credibility. Note that plaintiff had stated that he had anger problems for many years that interfered with employment. (AR 403)

(DE 13 at 29) (emphasis omitted).  Notably, Plaintiff does not cite to a single case to support his contention that the ALJ's credibility determination was fatally flawed.  He also fails to explain—other than pointing to a *de minimis* discrepancy as to *the source* of the cocaine reference—why the ALJ was somehow unjustified in using a major discrepancy between Plaintiff's testimony and records, let alone a

less than desirable demeanor while on the stand, as proper bases for discrediting the witness. [18]

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue,* 263 Fed. App'x 469, 475 (6th Cir. 2008); *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly."). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. It is for this reason that the ALJ's credibility findings have at times been characterized as "unchallengeable." *Payne v. Comm'r Soc. Sec.*, 402 Fed. App'x 109, 113-114 (6th Cir. 2010); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("A circuit court . . . may not review a

---

[18] At the hearing the ALJ mistakenly told Plaintiff that the records from Lifeway, not Dr. Gensterblum, showed Plaintiff had used cocaine. Plaintiff highlights this discrepancy in his brief as if it were significant. (DE 13 at 29.) That error is manifestly harmless, however, in light of the fact that Plaintiff flatly denied using cocaine *at all* when asked under oath by the ALJ; it is thus irrelevant that the ALJ mistakenly attributed Plaintiff's prior admission of cocaine usage to Lifeway, not Dr. Gensterblum. Moreover, the ALJ corrected his mistake at the hearing by noting in his written decision that Plaintiff had discussed cocaine usage with Dr. Gensterblum. (R. at 164) (citing Exhibit 7F, which is Dr. Gensterblum's report).

determination of credibility. It is for the Secretary and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony.") (alteration omitted).

Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.*; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."). The ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight." *Malcolm v. Comm'r of Soc. Sec.*, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (Parker, J.) (citing SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1997)).

Plaintiff told Dr. Gensterblum that he (Plaintiff) used cocaine until he was twenty-five. (R. at 590) ("Claimant also indicated a history of Cocaine use, but indicated he has not used it since he was 25 years old."). However, at the hearing

he told the ALJ that he had never used cocaine.  (R. at 38-39) ("Q:  How about cocaine?  A:  Never did cocaine.").  Contrary to Plaintiff's misplaced argument, the ALJ was permitted to rely upon that discrepancy as part of his credibility analysis.

It is unclear why Plaintiff believes the fact that the hearing was recessed due to his behavior is a factor counseling against the ALJ's credibility findings.  In any event, however, the ALJ explicitly noted the recess occasioned by Plaintiff's anger but also noted that Plaintiff behaved appropriately after the recess.  (R. at 164.) The ALJ also noted that the record contained remarks indicating that Plaintiff had been cooperative and behaved appropriately during interviews and examinations. The ALJ was entitled to, and in the best position to, form an impression that Plaintiff's behavior at the hearing was deliberate melodrama, or worse yet, a calculated attempt to bully the tribunal into awarding benefits. The ALJ may well have thought that the belligerence he encountered was "all an act."  No one was in a better position to make this assessment, and the standard of review precludes this Court from second-guessing it, particularly from the lofty perch of appellate scrutiny.  In sum, the ALJ permissibly addressed the record as a whole and explained adequately his reasons for assessing Plaintiff's credibility.[19]

_____

[19] Though his argument is not entirely clear or fully developed, it appears Plaintiff may be arguing that the ALJ improperly based his credibility determination in part on Plaintiff's marijuana usage.  However, the ALJ's references to Plaintiff's

## F.   CONCLUSION

For the foregoing reasons, the Undersigned **RECOMMENDS** that the Court

**GRANT** Defendant's motion for summary judgment (DE 16), **DENY** Plaintiff's

motion for summary judgment (DE 13), and **AFFIRM** the Commissioner's final

decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

---

marijuana usage were in his discussion of which impairments were severe (R. at
160-161) and in his RFC determination (and that brief reference merely noted
Plaintiff's testimony that he has reduced his marijuana usage).  (R. at 163.)  The
Court thus does not construe the ALJ's credibility determination as being at all
based upon Plaintiff's admitted marijuana usage.  Even if the Court leniently, and
solely for purposes of argument, were to construe the credibility determination as
Plaintiff urges, any resulting hypothetical error would be harmless because the
ALJ's credibility determination is, as previously discussed, otherwise based upon
substantial evidence, even though, in abstract theory only, a claimant's marijuana
usage could be construed as not being a proper sole basis upon which to base a
credibility determination.  *See, e.g., Vanblaricum v. Colvin*, 2014 WL 991834, at
*8 n.5 (D. Ore. March 13, 2014) ("The Commissioner declined to defend the ALJ's
adverse credibility finding based on Plaintiff's marijuana usage.").

party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: February 15, 2017　　　　　s/Anthony P. Patti　　　　　　　
　　　　　　　　　　　　　　　　　Anthony P. Patti
　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the forgoing document was sent to parties of record on February 15, 2017, electronically and/or by U.S. Mail.

　　　　　　　　　　　　　　　　　s/Michael Williams　　　　　　　
　　　　　　　　　　　　　　　　　Case Manager for the
　　　　　　　　　　　　　　　　　Honorable Anthony P. Patti